**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE NO.:

In re: Application of H.M.B. HOLDINGS
LIMITED Pursuant to 28 U.S.C. § 1782
to Conduct Discovery for Use in Foreign
Proceedings,

                              Petitioner,
_____/

**MEMORANDUM OF LAW IN SUPPORT OF H.M.B. HOLDINGS LIMITED'S**
**APPLICATION FOR AN ORDER TO CONDUCT DISCOVERY FOR USE IN**
**FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782**

Petitioner, H.M.B. Holdings Limited ("HMB") respectfully submits this memorandum of law in support of its Ex Parte Application for an Order Pursuant to 28 U.S.C. § 1782, to Conduct Discovery for use in Foreign Proceedings, filed on April 19, 2017.

**PRELIMINARY STATEMENT**

For almost a decade, Petitioner has been embroiled in a dispute with the Government of Antigua and Barbuda (the "Antiguan Government") over the 2007 expropriation of a 108-acre resort property in Antigua described by some to possess one of the best beaches in the world (the "Property"). Petitioner has never received full compensation for this expropriation, despite myriad (and summarily ignored) court orders mandating payment. Petitioner's long road led to the Privy Council in London, acting as Antigua's Highest Court, which in 2014 held that Petitioner was entitled to prompt payment of the fair market value of the Property plus interest—for a then total of approximately $40 million. But despite the order of the Privy Council, two years later Petitioner has still not been paid in full.

Citing a lack of funds, an insufficient legal basis to withhold full compensation in a timely fashion for expropriated property, Antigua improperly deferred payment of the Property pending its sale to a third party. That sale took place at the end of 2015. Although the publicly cited numbers are inconsistent, the Antiguan Government claims that the Property was sold to a Canadian company for approximately $23 million (the "Transaction"). The structure of this Transaction was not publicly disclosed. Based on public records and the Privy Council Order, it is apparent that the market value of the Property is significantly higher than the reported sale price. Petitioner believes that the reported sale price obfuscates commercial revenue streams being paid to Antigua that should be paid to Petitioner, following the Government's assertions (both public and private) that the entire proceeds of the sale of the Property would be applied to payment of the debt to the Petitioner.

Petitioner continues to actively seek to enforce the Privy Council Order before the Antiguan Courts. Discovery obtained to date demonstrates entities located in this jurisdiction have additional information which could lead to the identification of Antiguan Government assets that could lead to the satisfaction of the Privy Council Order.[1] In addition, Petitioner has begun an action in Canada also seeking to enforce the Privy Council Order against the Antiguan Government. Petitioner believes that HSBC, Standard Chartered, Citibank, OBM Miami, Norton Consulting, and Hensel Phelps Construction Co., each of which are located in this district, can identify commercial assets belonging to Antigua and may have evidence regarding

---

[1] Petitioner previously brought an application pursuant to 28 U.S.C. § 1782 in *In re Application of H.M.B. Holdings Limited Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings*, Case No. 1:16-MC-24816-CMA (S.D. Fla. Nov. 17, 2016). The Declaration of Natalia M. Querard ("Querard Decl.") referenced herein, can be found at Document No. 5. Unless otherwise noted, the facts cited herein are summarized from that filing and are based upon the Querard Declaration. Citations to Exhibits below, however, are to the Declaration of Paul M. Levine submitted contemporaneously with the Application in this case, filed on April 19, 2017.

the flow of funds related to the Transaction that can be used to enforce the Privy Council Order. Petitioner intends to use the discovery obtained in this proceeding to assist the Antiguan and/or Canadian courts to enforce the various unsatisfied compensation orders in favor of Petitioner.

## BACKGROUND

### A. The Antiguan Government Expropriated HMB's Property But Has Refused to Pay the Full Just Compensation as Ordered by the Privy Council

In 1971, Michael Kluge and six other U.S. citizens formed HMB to purchase the Property, which is situated on a mile long white coral sand beach in Antigua known as Half Moon Bay. Querard Decl. ¶ 11. HMB successfully developed, maintained, and managed the Property from 1973 to 1995, until it was destroyed by Hurricane Luis. *Id.* ¶ 12. The Property could not restart operations without a complete reconstruction. *Id.* After the Hurricane, Antigua attempted to broker a sale of the Property to Allen Stanford, an international banker who was later convicted of operating a massive Ponzi scheme. *Id.* HMB declined to sell the Property to anyone, but HMB's attempts to secure the necessary financing to redevelop the Property were repeatedly impeded by the Antiguan Government, likely as part of an effort to force a sale to Stanford. *Id.* ¶ 13.

In or around June 1999, the Antiguan Government resolved to expropriate the Property for a "public purpose," despite the fact that, at the same time, HMB was actively advancing plans to rebuild the Property. *Id.* ¶ 14. It was not until almost six years later, following many years of legal wrangling, that the Antiguan Government on March 8, 2005—without HMB's knowledge or participation—was registered as proprietor of the Property by order of the Antiguan Attorney General. *Id.* HMB opposed the expropriation in the Antiguan courts, but following several years of litigation, on June 5, 2007, the Privy Council upheld the expropriation—provided that the Antiguan Government made fair payments to HMB "within a reasonable time" as per the Land

Acquisition Act and the Antiguan constitution. *Id.* ¶ 15. The Antiguan Government took physical possession of the Property on July 23, 2007 (the "Expropriation"). *Id.* ¶ 16.

Following the Privy Council's June 2007 order, the Antiguan Government failed to initiate the process of compensation, as required by the Privy Council and the Antiguan Land Acquisition Act. *Id.* On January 5, 2010, after HMB sought an order of mandamus requiring the Antiguan Government to act, a Board of Assessment determined that the Property should be valued at $23,820,999.00, and awarded an interest rate of 10.25% until full satisfaction from the date of the Expropriation in 2007. *Id.* ¶ 17. The Antiguan Government did not pay any compensation at that time. *Id.* ¶ 17. HMB appealed the decision to Eastern Caribbean Court of Appeal, which, on December 5, 2011, allowed the appeal and substituted an award valuing the property at $45,499,102.09, not including interest (the "ECCA Order"). *Id.* ¶ 18. The Antiguan Government was granted leave to appeal to the Privy Council, but the Court of Appeal did not stay execution of its order; nevertheless, the Antiguan Government failed to pay anything to HMB even though HMB obtained court orders requiring the Antiguan Government to do so. *See id.* ¶¶ 18-21.

On February 26, 2014, the Privy Council held that HMB was entitled to compensation of $26,616,998, plus: (1) full market interest for three and a half years since the date of expropriation; and (2) 4% interest thereafter. *Id.* ¶ 22. The Privy Council stated that:

> It is a further striking feature of this case that despite an award from the Board made in January 2010, which the Government has never challenged, *not a penny of compensation has been paid*. This Board was informed that it has proved difficult to sell the site and that the money is not available, in a very small community, until it is sold. Even assuming that that is correct, *it provides no excuse for non-payment and it would work an injustice to HMB to require it to begin all over again when it has received nothing.*

*Id.* ¶ 23. On May 27, 2014, the Privy Council issued its final order and set the full market interest rate at 10.25% ($9,560,060 in interest from July 23, 2007 through January 22, 2011 and

4

4% thereafter). *Id.* ¶ 24.  Significantly, that final order emphasized that payment to HMB must be made forthwith, stating that "[h]er Majesty was pleased by and with the advice of Her Privy Council to approve the report and to order that those charged with administering the Government of Antigua and Barbuda and all others whom it may concern are to ensure that it is *punctually observed and obeyed*." *Id.* ¶ 24.

Even after the Privy Council's ruling, the Antiguan Government refused to pay Petitioner.  *Id.* ¶ 25.  Instead, the Antiguan Government repeatedly sought payment schedules that would have taken nearly 350 years just to pay off the interest.  *Id.* ¶¶ 25-26.  The Antiguan Government also stated that a $31 million sale of the Property would be completed by May 15, 2014, with a "significant portion" supposedly earmarked to pay HMB.  *Id.* ¶ 25.  Still, no payments were effectuated.  *Id.* ¶ 26.  HMB thus filed repeated applications before and obtained further orders from the Antiguan courts, but the Antiguan Government still failed to pay the Privy Council judgment.  *See id.* ¶¶ 29-31.

HMB finally received partial payment for the Property in December 2015, when an affiliate of Replay Resorts, Inc., Replay Destinations Ltd. (collectively, "Replay") sent HMB a letter containing a commercial bank draft from the Antiguan Commercial Bank for $16,528,921.88 ($20 million less $3,471,033.44 to pay an unrelated charge against the property allegedly owed by HMB).  *See id.* ¶¶ 32-35.  Notwithstanding this payment (first applied to interest and including payment for the alleged charge against the property), the Antiguan Government still owes HMB over $$22,149,435.03 (as of November 1, 2016), with interest compounding daily; over $21 million constitutes principal the Antiguan Government still owes to HMB.  *See id.* ¶¶ 6, 36.  No further installment payment—even the ones previously proffered by the Antiguan Government in its November 24, 2015 letter—have been paid, and a demand

5

letter dated February 9, 2016 from HMB to the Antiguan Government remains unanswered. *See id.* ¶¶ 6, 37.

### B. Replay's Use of Antigua's Citizenship By Investment Program to Fund Its Development of the Project

The Antiguan Prime Minister, Gaston Browne, stated that the Property was sold to Replay for $23 million in December 2015—which is well below fair market value. *Id.* ¶ 38; *see also id.* ¶¶ 39-44. In addition, there have been various, sometimes contradictory media reports and government public statements regarding the sale price of the Property ranging from $20 million to $31 million. *Id.* ¶ 41. The Antiguan Prime Minister also stated that "[t]he former administration was unable to structure a deal to make this project work. It was stalled for about 3 years until *we delivered a creative solution, which financially engineered this project*." *Id.* ¶ 42. Given the Antiguan Government's long history of failing to pay HMB pursuant to numerous Court orders, Petitioner believes that the "creative solution" allows additional capital to flow to the Antiguan Government without public disclosure, thereby justifying the Antiguan Government's continual failure to pay HMB based on a supposed lack of public funds. *Id.* ¶ 44.

One potential "creative solution" appears to be the Antiguan government's "Citizenship by Investment Program" specifically marketed to the Property, found at www.abpassport.com. *See also* Querard Decl. ¶ 43. To arrange this program, Replay (with the help of Antiguan Government officials) set up numerous corporate entities in Antigua. Replay has apparently been working on this transaction since at least May 2014, when it sent a letter requesting to incorporate a series of companies in Antigua. Declaration of Paul M. Levine ("Levine Dec.") at Ex. 1; *see also* Ex. 2 (June 24, 2014 letter seeking to incorporate companies for Replay).

#### 1. Replay's Corporate Entities

One company formed by Replay was Replay Destinations Limited, the entity that who

6

delivered the initial check received by HMB as partial payment for the Property.  The sole initial director was Gilbert Boustany, Consul General for Antigua in Miami.  Ex. 3; *see also* Querard Decl. ¶ 62 .  On March 18, 2015, Boustany was replaced as director by Replay executives and eventually Sir Clare Roberts, who acted as Replay's attorney in dealing with HMB.  Ex. 4; Ex. 5.  On December 4, 2015, the shareholder for Replay Destinations Limited changed from Replay Investment Group Inc. (a Canadian entity located in Vancouver, where Replay is headquartered) to Half Moon Bay Investments Limited Partnership.  Ex. 6.  On January 25, 2016, Replay Destinations Limited changed its name to Freetown Destination Resort Limited.  The name was derived because "[t]his company will be part of the group developing a hotel resort on Half Moon Bay (Freetown) being acquired from the Government of Antigua and Barbuda."  Ex. 7.

Replay formed additional companies in a similar way:

- **Replay Destinations Development 1 Limited**:  Its sole initial director was Boustany, who was replaced by Replay executives and Sir Clare Roberts.  Exs. 8-10.  On November 4, 2015, Replay Destinations Development 1 Limited changed its name to Replay Investment (Antigua) Inc.  Ex. 11.  As of year-end for 2015, Replay Investment Group Inc. was the shareholder of Replay Investment (Antigua) Inc.  Ex. 12.

- **Replay Destinations Management Limited**:  Its sole initial director was Boustany, who was later replaced by Replay executives and Sir Clare Roberts.  Exs. 18-20.  On January 19, 2016, the company changed its name to Freetown Hotel Development Limited.  Ex. 21.

Another company formed by Replay was Replay Destinations Sales Limited.  The sole initial director was again Boustany, who was later replaced by Replay executives and, eventually, Sir Clare Roberts.  Exs. 13-15.  On November 12, 2015, Replay Destinations Sales Limited changed its name to Half Moon Bay GP Inc.  Ex. 16.  According to the annual report for Half Moon Bay GP Inc. for the year ending December 31, 2015, the directors of the company were Paul Jorgensen (a Replay executive), Sir Clare Roberts, a Chinese Businessman named

7

Zhaoxu Chen,[2] and a British Businessman named Huaizheng Peng. The shareholders of the company were Replay Investment (Antigua) Inc., Marvel Treasure Developments Limited, a BVI entity, and Half Moon Bay CIP Management Inc. Ex. 17.

Half Moon Bay CIP Management Inc. is an Anguillan entity with an address of 29/F Huaihai Plaza, 1045 Huaihai Road Central, Shanghai, China (the same address provided for Zhaoxu Chen). Ex. 17. This is the same address provided for Visas Consulting Group's address in Shanghai on its website. http://www.visas.to/en/aboutvisas/branch. According to bank records, Half Moon Bay CIP Management also has an address at the Mason Complex, Suite 19 and 20, The Valley, in Anguilla, which is registered to Executive Corporate Services Inc. http://www.commercialregistry.ai/directory-Companymanager.html; Ex. 23 at Row 5. Half Moon Bay CIP Management also lists its address on abpassport.com (the website advertising CIP services for Replay's development of the Property) as Suite 2150, 745 Thurlow Street in Vancounver, Canada – the same address as Replay. www.abpassport.com.

2.  Replay's Payments Involving the Citizenship by Investment Program

Visas is one of the authorized agents listed on the www.abpassport.com website advertising Replay's development of the Property. www.abpassport.com/sqzj.html. On May 31, 2016, Visas sent $2.5 million for "Capital for CIP Half Moon Bay Capital LLP" to Freetown's account at First Caribbean International Bank via an account held at Standard Chartered Bank that were sent from a Standard Chartered account in the United States. Ex. 22 at Row 71. On June 21, 2016, Freetown sent $550,000 to Visas' account at Standard Chartered Bank using a Standard Chartered account in the United States as a correspondent bank. *Id.* at Row 98.

Half Moon Bay CIP Management paid nearly $119,000 in four transactions to Grant

---

[2] According to internet postings, Chen is an officer of Visas Consulting Group, Inc., a Canadian entity located in Vancouver. https://www.consultingcorp.org/visas-consulting-group-inc.

8

Thornton Client Account 2, at 11 Old Parham Road in St. Johns, Antigua. This address is the same address for Freetown. *Compare* Ex. 23 at Rows 1-4, *with* Ex. 7 at 5. The transactions were for Xudong Chen, Chui Ying Pang, Xianchun Teng, and Yijiangling Dong. Ex. 23 at Rows 1-4. A correspondent bank for these transactions was HSBC Bank in the United States. The Grant Thornton Client Account 2 also has an identical account numbers as Freetown's account at First Caribbean International Bank. Ex. 23.[3] Another individual, Yaping Sang, paid $60,000 directly to Half Moon Bay CIP Management. The account credited was HSBC, which also served as a correspondent bank for the transaction. Ex. 23 at Row 5.

Standard Chartered Bank maintains an office in this district at 1111 Brickell Avenue, Suite 1100, Miami, FL 33131. https://www.sc.com/us/branches.html. HSBC maintains multiple offices in this jurisdiction, including branches on Brickell Avenue, in Coral Gables, and Miami Beach. http://tinyurl.com/lpk2wte.[4]

### 3. Other Transactions With Entities Located in This Jurisdiction

Freetown also engaged in other transactions related to the development of the Property, some potentially involving the Antiguan Government. Records obtained to date indicate that Freetown directed four payments of $7500 each (for $30,000) to a Jean Pierre Shoul, who holds a U.S. Citibank account. Ex. 22 at Rows 27, 38, 50, & 62. One of the payments was specifically directed into a Citibank held at a branch on Brickell Avenue in Miami.[5] *Id.* at Row 27. Shoul also provided an address at 800 Claughton Island Drive, Apartment 1005, Miami FL 33131, but

---

[3] The account numbers for this entry and all entries in the financial documents provided have been redacted but can be provided upon request of the Court.
[4] *See* Declaration of Paul M. Levine submitted with the Application.
[5] Citibank maintains multiple branches in this district, including at 502 Brickell Avenue (*see* Ex. 22 at Row 27) and 1600 Coral Way in Miami, and 830 5th Street in Miami Beach.

that property is registered to Gilbert Boustany.[6]  Boustany is Consul General for Antigua in Miami.  Querard Decl. ¶ 62.

Freetown has also directed numerous payments to entities located in this jurisdiction that appear to be assisting with the design and construction of the Property.  These include payments to: (1) OBM Miami, Inc., located at 806 S. Douglas Road, Suite 400, Coral Gables, 33134, who is serving as architect on the project, *see* http://abpassport.com/obmi.html; (2) Norton Consulting Inc., located at 4254 W. Main Street, Jupiter, FL, 33458, for an Antiguan market study; and (3) Hensel Phelps Construction Co., located at 100 NE 3rd Avenue, Suite 440, Four Lauderdale, FL 33301.  These entities may have information concerning the structure of Replay's transaction with the Antiguan government, including any additional payments between Replay and the Antiguan Government.  Levine Dec. at Ex. 22 at Rows 4, 24, 42, 57, & 58 (OBM); *id.* at Rows 31 & 97 (Norton Consulting); *id.* at Row 51 (Hensel Phelps).

Banks with operations in this district also served as correspondent banks in transactions involving Replay and its subsidiary entities.  These include Citibank, which served as a correspondent bank in multiple transactions including payments from Freetown to Replay; and HSBC, which served as a correspondent bank in multiple transactions including payments from Freetown to Replay.  HSBC also appeared to serve as one of the banks involved in a transaction between Replay and Kunming Shui Fang Management Consultation Co. Ltd.  Ex. 25 at 5.

## ARGUMENT

Section 1782 of Title 28 of the United States Code permits the United States District Courts to grant discovery for use in a foreign proceeding.  The statute, in relevant part, states:

---

[6]https://www2.miami-dadeclerk.com/OfficialRecords/CFNDetails1.aspx?QS=5p8%2fNlBjKYBUNvMeCTSW%2b3kb%2fJz2991ji8RuQz7yc9Tlvi4c4ne%2fIA%3d%3d.

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . .  The order may be made . . . upon the application of any interested person.

28 U.S.C. § 1782.  "Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals." *Glock v. Glock, Inc.*, 797 F.3d 1002, 1007 (11th Cir. 2015) (citing *Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 247 (2004)).  "The current embodiment of the law reflects the policy choice to provide efficient means of assistance in our federal courts for litigants involved in international litigation and prompt foreign courts to follow our generous example and provide similar assistance to our court systems."  *Id.* (internal alterations and quotations marks omitted).

When a court finds that the statutory requirements of 28 U.S.C. § 1782 are met, it may, in its discretion, grant an application for discovery.  The United States Supreme Court has articulated a number of factors the district courts should consider when weighing an application under Section 1782.  As set forth in greater detail below, all these discretionary factors weigh in favor of granting Petitioner the requested discovery.

I.    **PETITIONER SATISFIES THE STATUTORY REQUIREMENTS OF 28 U.S.C. § 1782.**

Courts are authorized to grant an application made pursuant to 28 U.S.C. § 1782 where "(1) the request must be made 'by a foreign or international tribunal,' or by 'any interested person'; (2) the request must seek evidence, whether it be the "testimony or statement" of a person or the production of 'a document or other thing'; (3) the evidence must be 'for use in a proceeding in a foreign or international tribunal'; and (4) the person from whom discovery is sought must reside or be found in the district of the district court ruling on the application for assistance." *Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262, 1269 (11th Cir. 2014).  Petitioner's application satisfies

all three statutory requirements.

First, the subpoenaed entities are located in this district. *See* Querard Decl. ¶ 46-47. Petitioner seeks records that should be held by the entities in the ordinary course of business, and which the entities should easily be able to produce in this District.

Second, the discovery sought is for use in HMB's ongoing actions against the Antiguan Government pending in the Canadian and Antiguan court. Querard Decl. ¶¶ 7-10. *See In re Clerici*, 481 F.3d 1324, 1332-33 (11th Cir. 2007), *cert. denied Clerici v. United States*, 552 U.S. 1140 (2008) (finding that foreign enforcement proceedings qualify as a "proceeding" under § 1782). *See also Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 259 (2004) ("[W]e hold that § 1782(a) requires only that a [proceeding] be within reasonable contemplation."); *see also JAS Forwarding (USA), Inc.*, 747 F.3d at 1270-71; Querard Decl. ¶ 10.

Third, Petitioner is an "interested person" authorized to bring this application because it commenced the original actions against Replay and the Antiguan Government in Canada and Antigua, respectively. Querard Decl. ¶¶ 7-10. As the litigant commencing the foreign proceedings, Petitioner is clearly an "interested person" in the outcome of that litigation. *Intel Corp.*, 542 U.S. at 256. As the Plaintiff in the Canadian and Antiguan proceedings, Petitioner has the right to participate in each of those proceedings by presenting evidence. The U.S. Supreme Court has identified significant "participation rights" and the existence of "a reasonable interest in obtaining judicial assistance" as factors establishing a party as an "interested person. *Id.* These factors are clearly satisfied here.

Each of the requisite statutory elements necessary to permit this Court to order discovery under 28 U.S.C. § 1782 is satisfied.

**II.     THE COURT SHOULD EXERCISE ITS DISCRETION TO GRANT PETITIONER THE REQUESTED DISCOVERY ORDER.**

Once the statutory requirements of 28 U.S.C. § 1782 are met, a district court is free to grant discovery in its discretion. *JAS Forwarding (USA), Inc.*, 747 F.3d at 1271-72 (11th Cir. 2014). The Supreme Court has identified a number of factors that the district courts are to consider in ruling on a § 1782 application: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the proceeding underway abroad, and the receptivity of the foreign court to federal-court assistance; (3) whether the application conceals an attempt to circumvent foreign proof gathering restrictions of a foreign country; and (4) whether the application is unduly intrusive or burdensome. *See Intel Corp.*, 542 U.S. at 264-65; *JAS Forwarding (USA), Inc.*, 747 F.3d at 1271-72 (11th Cir. 2014). Here, all of these factors weigh in favor of granting Petitioner's application.

First, where, as here, discovery is sought from entities that are not participating in the foreign proceedings, the need for court-ordered discovery is apparent. As the Supreme Court explained, "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence. In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Intel Corp.*, 542 U.S. at 264 (internal citations omitted); *In re Clerici*, 481 F.3d 1324, 1335 n.14 (11th Cir. 2007) ("In many § 1782 cases, the person from whom discovery is sought is a nonparticipant in the foreign proceeding and outside the jurisdiction of the foreign tribunal.").

The second factor identified by the Supreme Court—the nature of the foreign proceedings and the receptivity of the foreign tribunal to federal court assistance—requires

courts to consider "(1) whether the United States assistance would offend the foreign country, and (2) whether the material sought is admissible in the foreign tribunal." *In re Application of Gemeinshcaftspraxis Dr. Med. Schottdorf* No. M 19-99, 2006 WL 3844464, at *6 (S.D.N.Y. Dec. 29, 2006). In weighing these elements, courts may only rely on "authoritative proof." *Euromepa S.A. v. R. Esmerian, Inc.,* 51 F.3d 1095, 1100 (2d Cir. 1995); *see also In re Clerici*, 431 F.3d at 1335 ("[T]here is nothing in the record to suggest that the district court should have declined to grant the § 1782 application based on the nature of the foreign tribunal or the character of the proceedings. . . ."). Here, there is no evidence that the discovery sought in this application would "offend" either Canada or Antigua. Nor is there any indication that the documents sought would be inadmissible in either Canada or Antigua. To the contrary, the discovery requested consists of ordinary business records held by the subpoenaed entities in their ordinary course of business. In particular, given the strong interest the Antiguan High Court must have in not seeing its order continue to be ignored by the Antiguan Government, Petitioner has reason to believe that the discovery sought would be welcomed by that court. *See, e.g.*, Querard Decl. ¶¶ 20, 24, 25. This factor thus weighs in favor of granting Petitioner's application.

The third factor also suggests that discovery should be granted, as this application is not an attempt to circumvent any foreign proof-gathering restrictions. "[T]he burden is on the opponent of a § 1782 request to prove that the foreign court would reject the evidence obtained through § 1782." *In re Application of Hornbeam Corp.*, No. 14 Misc. 424, 2014 WL 8775453, at *4 (S.D.N.Y. Dec. 24, 2014); *see also In re Clerici*, 431 F.3d at 1335 (stating that no evidence exists to demonstrate application was an attempt to circumvent foreign proof requirements); *Euromep S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1099-1100 (2d Cir. 1995) ("[W]e believe that a

14

district court's inquiry into the discoverability of requested materials should consider only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782."); *In re Application of FG Wilson (Engineering) Ltd. for Ex Parte Order to Obtain Discovery For Use in Foreign Proceedings*, No. 10-20839 CIV, 2011 WL 1114311, at *4 (S.D. Fla. Jan. 4, 2011) (explaining that Colombian law would not prevent § 1782 request), *aff'd* 2011 WL 1115349 (S.D. Fla. Mar. 24, 2011). The discovery sought in this application does not, to Petitioner's knowledge, violate any restrictions under either Canadian or Antiguan law on evidence gathering.

Finally, this application is not burdensome. Bank records are routinely sought for and produced via § 1782 petitions. *See, e.g., In re Application of Hornbeam Corp.*, No. 14 Misc. 424, 2014 WL 8775453, at *5 (S.D.N.Y. Dec. 24, 2014) (ordering production of bank records, including wire transfers, pursuant to § 1782); *Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Intern. (USA) Ltd.*, 785 F. Supp. 2d 434, 437 (S.D.N.Y. 2011) (granting § 1782 petition seeking disclosure of account statements, account opening materials, customer files, and due diligence materials); *In re Letter of Request for Judicial Assistance from Tribunal Civil de Port-au-Prince, Republic of Haiti*, 669 F. Supp. 403, 406 (S.D. Fla. 1987) (permitting subpoena under § 1782 for bank records for use in foreign proceedings). The requests to non-bank entities are narrowly tailored to ensure those entities need not conduct extensive searching; instead, Petitioner seeks those documents that will enable it to collect on its judgment.

### III.   THE APPLICATION SHOULD BE GRANTED *EX PARTE*

The Court should grant Petitioner's application ex parte, as courts routinely do so. *In re Ex Parte Application of Porsche Automobil Holding SE for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings*, 15-mc-417 (LAK) 2016 WL 702327, at *5 (S.D.N.Y. Feb. 18, 2016); *In re Application of Gorsoan Ltd. and*

15

*Gazprombank OJSC for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in a Foreign Proceeding*, No. 13 Misc. 397, 2014 WL 7232262, at *5 (S.D.N.Y. Dec. 10, 2014).  The subpoenaed entities, who all do business in this District,[7] will suffer no prejudice because they will permitted to challenge the subpoenas after service if they believe a challenge is warranted.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court (a) grant the Application for Order to Conduct Discovery in a Foreign Proceeding *Ex Parte*; (b) enter the Proposed Order attached to the Application as Exhibit "A," (c) grant Petitioner leave, pursuant to 28 U.S.C. § 1782, to serve the subpoenas attached to the Application as Composite Exhibit "B"; and (d) grant any and all other further relief to Petitioner as deemed just and proper.

Dated this 19th day of April, 2017.

                                            Respectfully submitted,

*/s/ Michael S. Vitale*
Michael S. Vitale
Florida Bar No. 17136
E-mail:  mvitale@bakerlaw.com
Robert W. Sowell
Florida Bar No. 113615
E-mail: rsowell@bakerlaw.com
**BAKER & HOSTETLER LLP**
200 South Orange Avenue, Suite 2300
Orlando, Florida 32801
Telephone:  407-649-4083
Facsimile:  407-841-0168
*Counsel for Petitioner*

---

[7] As indicated in the Application, non-party witness Citibank, N.A. has several branches in Miami and Miami Beach.  The subpoena to Citibank in Composite Exhibit "B" is addressed to a location in New York because this is Citibank's nationwide subpoena compliance processing department, where it agrees to accept service of subpoenas.  Likewise, HSBC has several branches in Miami and Miami Beach, but its subpoena is addressed to a location in South Dakota because this is HSBC's nationwide subpoena compliance processing department, where it accepts service of subpoenas.